# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 48588

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | Filed: August 12, 2022 |
| Plaintiff-Respondent, | ) | |
| | ) | Melanie Gagnepain, Clerk |
| v. | ) | |
| | ) | THIS IS AN UNPUBLISHED |
| DAVID KARL KIRKEMO, | ) | OPINION AND SHALL NOT |
| | ) | BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Washington County. Hon. Susan E. Wiebe, District Judge.

Order denying motion to suppress, reversed; judgment of conviction for possession of a controlled substance, vacated; and case remanded.

Eric D. Fredericksen, State Appellate Public Defender; Jason C. Pintler, Deputy Appellate Public Defender, Boise, for appellant. Kiley Heffner argued.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent. Mark W. Olson argued.

_____

HUSKEY, Judge

David Karl Kirkemo appeals from his judgment of conviction for felony possession of a controlled substance. Kirkemo alleges the district court erred in denying his motion to suppress because his detention was not supported by a reasonable, articulable suspicion of criminal activity. Because the State did not present sufficient evidence demonstrating a reasonable, articulable suspicion of criminal activity at the time Kirkemo was detained, the district court erred in denying his motion to suppress. Accordingly, the order denying Kirkemo's motion to suppress is reversed, the judgment of conviction is vacated, and the case is remanded.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The district court made the following findings of fact, which are uncontested. Around 3 a.m., Officer Jakich noticed Kirkemo sitting in his car slumped over his steering wheel in a gas

1

station parking lot. Although Officer Jakich thought something was off, he did not make contact with Kirkemo at that time. Kirkemo subsequently drove away, and Officer Jakich followed in his patrol vehicle. To Officer Jakich, Kirkemo appeared lost; while driving under the speed limit, Kirkemo drove down a dead-end road, turned around, circled the block, and proceeded down an alley before pulling over next to a residence.

Officer Jakich did not activate his patrol lights, parked a couple of car lengths behind Kirkemo's car, and approached Kirkemo on foot. Officer Jakich asked Kirkemo if he was lost; Kirkemo said he was not and was on his way to a friend's house. Officer Jakich noticed Kirkemo's pupils were constricted, which he believed was unusual because there was very little light at that time in the morning. When Officer Jakich mentioned Kirkemo's constricted pupils, Kirkemo explained his pupils were constricted because he had an astigmatism and Officer Jakich's flashlight was shining in his eyes. As Officer Jakich's body camera video confirms, his flashlight occasionally shined in Kirkemo's eyes as they were speaking.

Kirkemo asked whether Officer Jakich was pulling him over, and Officer Jakich explained that he was investigating Kirkemo because of his constricted pupils. Officer Jakich asked for Kirkemo's identification. When Kirkemo opened his car door to look for his identification, Officer Jakich saw a container with a marijuana leaf on it, which he recognized as being from a marijuana dispensary. A subsequent search of Kirkemo's car resulted in the discovery of controlled substances and Kirkemo was arrested.

The State charged Kirkemo with felony possession of a controlled substance (methamphetamine), Idaho Code § 37-2732(c)(1); misdemeanor charges of possession of a controlled substance (marijuana), I.C. § 37-2732(c)(3); possession of drug paraphernalia, I.C. § 37-2734A; and possession of a legend drug without a prescription, I.C. § 54-1732(3)(c). Kirkemo filed a motion to suppress, arguing that Officer Jakich lacked reasonable suspicion to detain Kirkemo, both when Officer Jakich initially approached and when he asked for Kirkemo's identification. The district court held a hearing on the motion where only Officer Jakich testified. The district court found that although the initial encounter with Kirkemo was consensual, Kirkemo was seized when Officer Jakich stated he was investigating Kirkemo and asked for his identification. The district court found the seizure was supported by reasonable suspicion because Officer Jakich saw Kirkemo slumped over his steering wheel in the gas station parking lot, driving

2

around like he was lost, and having constricted, pinpoint pupils. Accordingly, the district court denied Kirkemo's motion to suppress.

Pursuant to a plea agreement, Kirkemo entered a conditional guilty plea to felony possession of a controlled substance, reserving his right to appeal the denial of his motion to suppress. The misdemeanor charges were dismissed. The district court sentenced Kirkemo to a unified term of five years, with two years determinate, and retained jurisdiction. Kirkemo timely appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

Kirkemo alleges the district court erred when it denied his motion to suppress because Officer Jakich lacked a reasonable, articulable suspicion that Kirkemo was engaged in criminal activity at the time of the investigative detention. Kirkemo does not challenge any of the district court's factual findings or the veracity of Officer Jakich's testimony at the suppression hearing. In response, the State alleges the district court did not err because the investigative detention was supported by reasonable suspicion.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Generally, evidence obtained as a result of an unreasonable search or seizure must be suppressed, *Wong Sun v. United States*, 371 U.S. 471, 485 (1963), and typically, seizures must be based on probable cause to be reasonable. *Florida v. Royer*, 460 U.S. 491, 499-500 (1983). A limited investigatory detention based on less than probable cause is permissible if it is based upon specific articulable facts which justify suspicion that the detained person is, has been, or is about

to be engaged in criminal activity. *State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003). The reasonableness of the suspicion must be evaluated upon the totality of the circumstances at the time of the investigative detention. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999). The reasonable suspicion standard requires less than probable cause but more than mere speculation or instinct on the part of the officer. *Id.* An officer may draw reasonable inferences from the facts in his possession, and those inferences may be drawn from the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988). An experienced officer's hunch that something is out of the ordinary is not sufficient to meet the stringent requirements of the Fourth Amendment. *State v. Neal*, 159 Idaho 919, 925, 367 P.3d 1231, 1237 (Ct. App. 2016).

The district court found the following circumstances justified Officer Jakich's detention of Kirkemo: first, Officer Jakich saw Kirkemo slumped over the steering wheel of his car while parked at 3 a.m.; second, Officer Jakich thought Kirkemo appeared lost; and third, Officer Jakich noticed Kirkemo had constricted pupils. The State does not argue, and we do not hold, that any of the circumstances independently created reasonable, articulable suspicion to justify Kirkemo's investigative detention. *See State v. Bly*, 159 Idaho 708, 710, 366 P.3d 193, 195 (Ct. App. 2016) (holding strange or unusual behavior by itself is not enough to establish reasonable suspicion); *see also State v. Grigg*, 149 Idaho 361, 364, 233 P.3d 1283, 1286 (Ct. App. 2010) (holding bloodshot eyes alone are not enough to establish reasonable suspicion of intoxication). Instead, the State contends that under the totality of the circumstances, Officer Jakich had reasonable, articulable suspicion to detain Kirkemo.

The reasonableness of the officer's suspicion of criminal activity must be evaluated based upon the totality of the circumstances. Here, the objective circumstances preceding Officer Jakich's detention of Kirkemo do not create a reasonable, articulable suspicion that Kirkemo was, had been, or was about to be involved in criminal activity.

Officer Jakich testified about three circumstances in this case; however, neither Officer Jakich's observation of Kirkemo at the gas station nor his driving pattern are captured on Officer Jakich's body camera. Consequently, this Court is left with Officer Jakich's testimony for a description and impression of those events for purposes of evaluating the totality of the circumstances.

4

When describing what he witnessed at the gas station, Officer Jakich testified he saw Kirkemo sitting in his car, "[k]ind of slumped, slumped[1] over forward." Although "[s]omething appeared off at that time," Officer Jakich testified he "couldn't explain it. It just didn't seem right. It didn't seem normal." However, Officer Jakich did not believe that anything was wrong, just that something appeared different:

State:              Okay.
                    And so you never talked to him at that time, but?
Officer Jakich:  No.
State:              But you noticed that he was slumped over his steering wheel and
                    something was--
Officer Jakich:  Appeared to be.
State:              -- wrong?
Officer Jakich:  Appeared to be different than normal.

Officer Jakich did not believe this conduct was sufficiently suspicious to make contact with or detain Kirkemo, and Officer Jakich never connected this behavior to any suspected criminal activity.

Second, Officer Jakich followed Kirkemo and observed him drive down a dead-end road, turn around, circle the block, and proceed down an alley before pulling over next to a residence. Officer Jakich never characterized Kirkemo's driving pattern as evasive, indicative of driving under the influence, or any other suspected criminal activity. Instead, Officer Jakich described Kirkemo as "driving lost" and, accordingly, testified that once Kirkemo came to a stop, his only concern was whether Kirkemo was, in fact, lost.

The third piece of information Officer Jakich relied on was Kirkemo's constricted pupils, which Officer Jakich noticed after his flashlight shined in Kirkemo's eyes. Officer Jakich testified that Kirkemo's slumped over posture and driving pattern, even aggregated, did not give him any suspicion of criminal activity, let alone a reasonable suspicion of criminal activity. Both Officer Jakich's body camera video and his testimony reflect that Officer Jakich's primary concern was the third factor, Kirkemo's constricted pupils. In the body camera footage admitted during the suppression hearing, after Kirkemo parked and Officer Jakich exited his car, Officer Jakich

---

[1]     We recognize that word choices affect the lens through which we view the facts giving rise to a reasonable suspicion. Two officers may describe the same scene using different words. One officer's description may include the word "slumped" while another officer's description may say "leaning forward," each of which leaves very different impressions of the behavior being described.

approached Kirkemo and asked how Kirkemo was doing. Kirkemo responded, "Good. What's up?" Officer Jakich answered: "Nothing, I was just checking on you. You were driving around like you were lost." After Kirkemo said he was not lost, he just could not remember quite where the house was that he was going to, Officer Jakich said: "Okay. You're good to go?" Kirkemo said, "Yep, good to go. Are you good to go?" Officer Jakich replied, "Yah, why you got pinpoints man?" Kirkemo explained that it was because Officer Jakich's flashlight was shining in his eyes. Officer Jakich replied that he was not shining his light in Kirkemo's eyes at that point and stated, "eyes don't change that quick, man."[2]

Officer Jakich then asked Kirkemo for his identification, and the following exchange occurred:

| | |
|---|---|
| Kirkemo: | Are you pulling me over for a reason? Are you pulling me over? |
| Officer Jakich: | Well, I'm investigating something now with your eyes. I just came up to talk to you, make sure you weren't lost. |
| Kirkemo: | That doesn't make any sense. |
| Officer Jakich: | What do you mean it doesn't make any sense? |
| Kirkemo: | Why you're like talking to me now. |
| Officer Jakich: | Why I'm talking to you now? |
| Kirkemo: | Yeah. |
| Officer Jakich: | Because your eyes are different. |
| Kirkemo: | So, I have- |
| Officer Jakich: | Makes me think you're under the influence of something. |
| Kirkemo: | No, I'm not. |
| Officer Jakich: | You're not? Okay. Do you have your ID on you? |

During the suppression hearing, Officer Jakich reiterated that the primary basis for his detention of Kirkemo was his constricted pupils:

| | |
|---|---|
| State: | Okay. And in doing that process [shining the flashlight] what did you notice that caused you to continue or to start investigating rather than just finding out about whether or not he was lost? |
| Officer Jakich: | That his pupils were constricted. |
| State: | Okay. What do you call those? |
| Officer Jakich: | Pinpoint pupils. |
| State: | Okay. |

---

[2] The district court found that "the officer's body camera confirms that Officer Jakich shined his flashlight somewhat in [Kirkemo's] eyes."

6

And so up until the time that you walked up to him, was there any suspicion before that, other than what was back at Maverick.

Officer Jakich:   No. Just the driving lost.

Later, Officer Jakich again testified that Kirkemo's constricted pupils were the biggest concern:

State:   And then reflecting back on [Kirkemo's] condition at [the gas station], so since he wasn't lost, is that how you came to the conclusion, as well as the pinpoint eyes?

Officer Jakich:   The eyes were my biggest conclusion, but all of it; yeah.

As Officer Jakich testified, neither of the first two circumstances aroused his suspicion that Kirkemo was engaged in any criminal activity. The only remaining factor, Kirkemo's constricted pupils, is insufficient in the absence of other particularized facts that would lead one to reasonably conclude Kirkemo was, had been, or was about to be engaged in criminal activity.

This Court has previously ruled that bloodshot eyes are not enough to establish reasonable suspicion that a crime is being committed. *Grigg*, 149 Idaho at 364, 233 P.3d at 1286. In *Grigg*, the defendant had glassy bloodshot eyes, a reddened conjunctiva, and eyelid tremors. *Id*. at 363-64, 233 P.3d 1285-86. The officer testified that, based on the officer's training and experience, such characteristics indicate that a person is under the influence of a controlled substance. *Id*. at 364, 233 P.3d at 1286. We ruled that, although bloodshot eyes alone are not enough, when bloodshot eyes are paired with other characteristics, the overall condition of an individual's eyes may give rise to reasonable suspicion. *Id*. Given the totality of the circumstances, we held that the officer had reasonable suspicion to detain Grigg. *Id.* at 363-64, 233 P.3d 1285-86.

The facts of this case are distinguishable from those in *Grigg*. In *Grigg*, the officer had multiple visible characteristics in Grigg's eyes which, when aggregated, supported a reasonable suspicion of criminal activity. Here, Officer Jakich did not find either of the first two circumstances suspicious; in the absence of evidence of those events, we are left to rely on his description and impression of those events and must conclude, as did Officer Jakich, that neither of the first two circumstances were sufficiently suspicious to justify detaining Kirkemo. The only remaining factor was Kirkemo's constricted pupils, which were noticed after Officer Jakich shined his flashlight in Kirkemo's eyes. Like bloodshot eyes, Kirkemo's constricted pupils are insufficient in the absence of other particularized, articulable facts of suspected criminal activity that would lead the officer to reasonably conclude that Kirkemo was, had been, or was about to be engaged in criminal activity.

7

Without a sufficient factual basis, Officer Jakich's belief that something "just didn't seem right" was only a hunch that something criminal was afoot, which was insufficient to justify the investigative detention in this case. *See Bly*, 159 Idaho at 710, 366 P.3d at 195 (holding lawful but unusual conduct that does not indicate criminal activity does not justify detention). As a result, Kirkemo's detention violated the Fourth Amendment, and the district court erred by denying Kirkemo's motion to suppress.

## IV.

## CONCLUSION

The State did not present sufficient evidence demonstrating a reasonable, articulable suspicion of criminal activity at the time Kirkemo was detained. Accordingly, the district court erred in denying Kirkemo's motion to suppress. The order denying Kirkemo's motion to suppress is reversed, the judgment of conviction for possession of a controlled substance is vacated, and the case is remanded for proceedings consistent with this decision.

Judge BRAILSFORD, **CONCURS**.

Judge LORELLO, **DISSENTS.**

I would hold that, based on the objective facts available to the officer, the officer had reasonable suspicion to detain Kirkemo. As such, I dissent.

At the point of Kirkemo's detention, the officer in this case had reasonable suspicion that Kirkemo was driving under the influence. The district court found the officer's initial contact with Kirkemo was consensual but that the encounter evolved into a seizure once the officer informed Kirkemo he was being investigated and asked him for identification. The district court concluded the seizure was justified based on the totality of the circumstances and the information available to the officer at that time. The circumstances and the information available to the officer at that point included the following. The officer first noticed Kirkemo sometime around 3:00 a.m. sitting in his vehicle in a Maverick parking lot. As the officer was walking from the store to his patrol vehicle, he noticed Kirkemo in his vehicle "kind of slumped, slumped over forward." The officer testified that "something appeared off at that time." As a result, the officer followed Kirkemo when he left the parking lot. Kirkemo then drove around like he was "lost." As described by the

8

district court, Kirkemo "drove down a dead end road, turned around, circled the block and went down an alley before finally pulling over next to a residence."[1]

Kirkemo was also "driving under the speed limit." Once Kirkemo stopped, the officer also pulled over, stopping a "couple of car lengths" away from Kirkemo and without activating the officer's patrol lights. In other words, the officer did not initiate a traffic stop.

By the time the officer parked and stepped outside of his patrol vehicle, Kirkemo was already out of his vehicle with an unlit cigarette in his mouth and his phone in his hand. The officer approached Kirkemo and asked how he was doing. Kirkemo responded, "Good. What's up?" The officer answered: "Nothing, I was just checking on you. You were driving around like you were lost." After Kirkemo said he was not lost, the officer said: "Okay. You're good to go?" Kirkemo said he was "good to go" and asked the officer: "Are you good to go?" The officer then inquired about Kirkemo's eyes, asking him why they were "pinpoint." Kirkemo explained that it was because the officer shined his flashlight in them.[2] The officer noted he was not shining his light in Kirkemo's eyes at that point and commented, "Eyes don't change that quick, man." The officer then asked Kirkemo for his identification and the following exchange ensued:

| | |
|---|---|
| Kirkemo: | Are you pulling me over? |
| Officer: | Well, I'm investigating something now with your eyes. I just came up to talk to you, make sure you weren't lost. |
| Kirkemo: | Um, that doesn't make any sense. |
| Officer: | What do you mean it doesn't make any sense? |
| Kirkemo: | Why you're, why you're, like, talking to me now. |
| Officer: | Why I'm talking to you now? |
| Kirkemo: | Yeah. |
| Officer: | Because your eyes are different. |
| Kirkemo: | So? I, I have . . . |
| Officer: | Makes me think you're under the influence of something. |
| Kirkemo: | No, I'm not. |

---

[1] At the preliminary hearing, Kirkemo argued that the officer "followed him for too many blocks, too many turns," which Kirkemo believed was illegal. Although Kirkemo did not advance this argument at the suppression hearing, this explanation of his driving pattern reflects his awareness that the officer was following Kirkemo.

[2] The district court found that the officer's bodycam video "confirms" the officer "shined his flashlight somewhat in [Kirkemo's] eyes at times" but that his "pupils were noticeably constricted even in the absence of direct light from the flashlight." In relation to this finding, the officer testified that he tries to "stay mid-body range" with his flashlight "so it illuminates quite a bit" and will "illuminate their face." The officer also testified that he tries not to "purposely ever put it into somebody's eyes, because it's bright," so he tries to keep "the main part of the flashlight . . . away from people's eyes."

```
Officer:        You're not?
Kirkemo:      Unh-uh.
Officer:         Okay.  Do you have your ID on you?
```

The question in this case is whether the officer had reasonable and articulable suspicion to detain Kirkemo at that time.  Although analysis of reasonable and articulable suspicion under the Fourth Amendment is fact-specific, the Idaho Supreme Court's recent opinion in *State v. Bonner*, 167 Idaho 88, 467 P.3d 452 (2020) is instructive in resolving the question in this case.

In *Bonner*, an officer noticed Bonner driving in a manner that led the officer to believe Bonner was trying to avoid the officer.  Bonner then pulled into a parking lot, parked his car, left it, walked to a closed business and attempted to open the doors, and then walked around the building away from the officer.  The officer thought Bonner may have been trying to distance himself from the vehicle he was driving, which had temporary tags, although the officer had no information that the tags were invalid.  When the officer eventually made contact with Bonner, the officer asked Bonner what he was doing and asked him for identification.  Bonner gave the officer his driver's license and the officer asked Bonner if the vehicle the officer saw Bonner driving belonged to him; Bonner did not answer.  At that point, the officer told Bonner to sit on the curb. The officer also told Bonner to keep his hands out of his pockets after he "fumbled for something" inside them and told him to explain why he was there.  Ultimately, upon further investigation, the officer learned Bonner was on parole for driving under the influence and that his license was suspended.  Ultimately, the officer arrested Bonner for driving without privileges and suspicion of driving under the influence (based on the odor of alcohol).

Bonner filed a motion to suppress, arguing that the officer lacked reasonable and articulable suspicion that a crime had occurred or was about to occur.  Bonner also argued that he was seized when the officer took Bonner's identification and ordered him to sit on the curb.  The district court granted Bonner's motion to suppress, concluding that he was seized when the officer restricted Bonner's movements by ordering him to sit on the curb. The State appealed.  On appeal, the Idaho Supreme Court reversed, holding that the district court erred in ruling that the officer lacked reasonable suspicion to detain Bonner.  In reaching this conclusion, the Court cited several relevant Fourth Amendment principles.  In particular, the Court articulated the well-established totality of the circumstances test, which requires courts to consider the totality of the circumstances of each case in order to determine whether the officer has a particularized and objective basis for suspecting legal wrongdoing.  The Court also noted that the well-established principle that

10

determining whether reasonable suspicion exists does not require a court to rule out the possibility of innocent conduct because doing so "would severely limit the ability of law enforcement officers to prevent crime and ensure public safety." *Bonner*, 167 Idaho at 95, 467 P.3d at 459. The Court observed that it "would be naïve to assume that most criminal defendants, even unsophisticated ones, do not attempt to avoid detection and mask their true intentions by acting in an ambiguous manner so that they may appear beyond suspicion." *Id.* However, an officer must still identify specific and articulable facts that, when taken together with the rational inferences therefrom, justify an investigative detention. *Id.*

Applying the foregoing principles in *Bonner*, the Court held the investigative detention was constitutionally permissible. The Court concluded that, based on the facts, it was reasonable for the officer to infer that Bonner was trying to evade the officer and that Bonner was trying to distance himself from the vehicle he was driving such that "there must be some kind of violation related to his vehicle," such that it might be stolen or was not properly registered. *Id.* These facts, the Court reasoned, were sufficient to support reasonable suspicion of "vehicle-related crimes." *Id.* at 96, 467 P.3d at 460. As a result, the officer's feeling that "something more was going on" could not "be brushed away as a mere hunch that a crime related to the vehicle was in progress." *Id.* Because the officer provided a "factual basis for his suspicion, as evinced by the totality of the circumstances," the investigatory detention was "precisely the type of determination that alert law enforcement officers are permitted to make under the Fourth Amendment." *Id.*

Just as the officer's suspicion in *Bonner* that "something more was going on" was justified by objective facts, the officer in this case provided the factual basis for his suspicion that "something appeared off" about Kirkemo when the officer first saw Kirkemo "slumped over forward" in his vehicle while parked at the Maverick at around 3:00 a.m. The officer testified that something "[a]ppeared to be different than normal." When asked if he "act[ed] upon that later," the officer said: "Later, when I talked to [Kirkemo]."

As a result of his observations in the Maverick parking lot, the officer followed Kirkemo who took a circuitous route and ultimately parked in a different location. Although the officer did not initiate a traffic stop, he testified he made contact with Kirkemo because he "had been driving around like he was lost" after previously observing him "slumped" over in the parking lot. When the officer began speaking with Kirkemo, and before asking him for his identification, the officer noticed Kirkemo's pupils were "pinpoint." Shortly after that observation, the officer's bodycam

11

video reflects the officer telling Kirkemo the officer was investigating Kirkemo because the officer thought Kirkemo was "under the influence of something." An officer's observation of a driver slumped over in the driver's seat of a vehicle in the early morning, as well as the conditions of a driver's eyes, can factor into whether there is reasonable suspicion of driving under the influence. *In re Clayton*, 113 Idaho 817, 818-19, 748 P.2d 401, 402-03 (1988) (holding that officer had reasonable suspicion of driving under the influence when the officer observed, at 1:30 a.m., a driver slumped forward in the driver's seat of a vehicle with the engine running and headlights on); *State v. Grigg*, 149 Idaho 361, 364, 233 P.3d 1283, 1286 (Ct. App. 2010) (holding that officer had reasonable suspicion of driving under the influence based on officer's experience and training when driver's eyes were bloodshot and glassy with "reddening of the conjunctiva of [the driver's] eyes and eyelid tremors"). Regarding these observations, the officer's testimony at the suppression hearing included the following:

> Q. What did you notice that caused to continue or to start investigating rather than just finding out about whether or not he was lost?
> A. That his pupils were constricted.
> Q. Okay. What do you call those?
> A. Pinpoint pupils.
> Q. Okay. And so up until the time that you walked up to him, *was there any suspicion before that, other than what was back at Maverick*?
> A. No. *Just the driving lost*.
> Q. Okay. Driving lost at that time?
> A. *As if he were lost.*
> Q. Yeah, at that time of the morning?
> A. Correct.

(Emphasis added).

In sum, the officer testified to objective facts, including Kirkemo's pinpoint pupils, his driving pattern, the time of day, and his appearance at the Maverick that caught the officer's attention in the first instance. Based on the totality of the information available to the officer prior to Kirkemo's detention, there was an objectively reasonable basis to detain Kirkemo to confirm or dispel whether he was driving under the influence. Thus, I would conclude that the district court did not err in denying Kirkemo's motion to suppress based on its conclusion that there was reasonable suspicion supporting his detention.

12